543 So.2d 619 (1989)
Daniel M. CORE, Plaintiff-Appellee,
v.
D.B. MARTIN, Jr., Defendant-Appellant.
No. 20528-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1989.
*620 Loridans & Loridans by Henri Loridans, Bossier City, for defendant-appellant.
F.Q. Hood, Jr., Bossier City, for plaintiff-appellee.
Before HALL, MARVIN, and FRED W. JONES, JR., JJ.
MARVIN, Judge.
In this action instituted by Dr. Core for the amount owed by Dr. Martin on a promissory note, Dr. Martin appeals that part of the judgment that rejected his reconventional demand for damages founded on unfair trade practices (unfair competition and misappropriation of trade secrets) under LRS 51:1405, 1433.
The issue is essentially factual. Dr. Martin contends the evidence was legally sufficient to prove the alleged violation under each statute.
We affirm, finding that the trial court was not clearly wrong in its determination that the conduct of Dr. Core did not constitute an unfair trade practice. Dufau v. Creole Engineering, Inc., 465 So.2d 752 (La.App. 5th Cir.1985), writ denied.

FACTS
The litigants are two veterinarians who practiced together for about three years. Dr. Core now practices for himself. He sued Dr. Martin on an $11,000 promissory note that was executed for compensation that was due Dr. Core when he left Dr. Martin. Dr. Martin reconvened for damages, alleging that Dr. Core had engaged in unfair competition.
Dr. Martin has practiced veterinary medicine for 35 years. Dr. Core began working for him in June 1982, after completing a veterinary internship at Auburn University. Because of his training, Dr. Core provided more specialized services than Dr. Martin. Dr. Core worked primarily at the Martin Animal Hospital clinic in Bossier City. Dr. Martin worked primarily at his other two clinics in Shreveport. Dr. Core was paid a salary as well as a percentage of the annual net profits from the three clinics.
In mid-December 1985, Dr. Martin learned from another that Dr. Core was then planning to start his own practice. Dr. Core testified he intended to tell Dr. Martin about his plans but had not done so because he had not yet acquired the property where he hoped to build his own clinic. Dr. Core offered to stay with Dr. Martin until March 1986, when Dr. Core expected his building to be finished. On December 28, 1985, Dr. Martin told Dr. Core his services were no longer needed. He owed Dr. Core $11,000 compensation at that time and executed his note to Dr. Core for that amount.
Dr. Core did not tell any Martin Animal Hospital clients of his plans before December 28, 1985. He copied the names and addresses of 360 clients at the Bossier City clinic whose pets he had personally cared for, planning to send them announcements of the opening of his new practice. Dr. Core and another veterinarian testified that a veterinarian has a professional duty to notify clients when he or she changes a business location.
After he left Martin Animal Hospital, Dr. Core mailed two business announcements to the clients whose addresses he had copied from Martin Animal Hospital's records, as well as mailing them to other friends, relatives and prospective clients. The first *621 announcement gave the address and phone number of his temporary clinic and the address and estimated opening date of his permanent facility. The second was an invitation to attend an open house at Dr. Core's new facility.
Dr. Core testified that 178 of the 360 Martin Animal Hospital clients who were mailed announcements came to his new clinic at least once. Seventy-four of the 178 were friends or relatives whose pets he had cared for at Martin Animal Hospital. The other 104 were clients with whom he had had only a business relationship. At trial, about two years after starting his own practice, Dr. Core had 1,980 clients.
The trial record does not show how many clients Martin Animal Hospital had, either before or after Dr. Core left in December 1985. Dr. Martin showed that gross annual revenues from his three clinics declined $50,000 in 1986.
Dr. Martin calculated his alleged damages on the basis of a study published in a professional journal. He testified that the study showed that the average amount spent by each client of a veterinarian was $60 per year over the 10-year average life of his or her pet. Because Dr. Core admitted that 178 of his present clients were formerly Martin Animal Hospital clients, Dr. Martin claims that his damages should therefore be $60 for each of the 178 clients that Dr. Core admitted had followed Dr. Core to his new practice, or a total of $10,680, plus attorney fees under the Title 51 Unfair Trade Practices Law, §§ 1401-1418, and the Uniform Trade Secrets Act, §§ 1431-1439.
Dr. Core would limit the effect of these statutes to only an employer-employee relationship, contending they do not apply to the "partnership" relationship he had with Dr. Martin. He testified that he and Dr. Martin had formed a partnership and argued that, as a partner, he had "a right to the client list as much as Dr. Martin did."
Dr. Martin contended their relationship was an employment relationship, stating that they had discussed but had not consummated or agreed to form a partnership. The trial court did not resolve this issue but found no statutory violations even if the litigants had only an employer-employee relationship as Dr. Martin contended.

STATUTES
LRS 51:1405 declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of all trade or commerce are unlawful. The statute does not define "unfair methods of competition," but relegates to the courts the task of determining, on a case-by-case basis, whether particular conduct violates the statute. Conduct is deemed unlawful if it involves fraud, misrepresentation, deception, breach of fiduciary duty, or other unethical conduct. Dufau v. Creole Engineering, Inc., supra.
A court must balance the former employee's right to "try his hand" at competing with his former employer against the employer's right to fair play. Huey T. Littleton Claims Service v. McGuffee, 497 So.2d 790, 793 (La.App. 3d Cir.1986).
Although customer lists may constitute trade secrets, the threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact. LRS 51:1431; Engineered Mechanical Services v. Langlois, 464 So.2d 329 (La.App. 1st Cir.1984), writ denied. Trade secrets were protected by the Unfair Trade Practices Law before the Uniform Trade Secrets Act was adopted in 1981. Langlois, supra.
An employer's claim against a former employee for misappropriation of customer lists is also assessed on a case-by-case basis by considering these factors:
the manner in which and the purpose for which the customer lists are compiled;
the conduct and motivation of the employee before and after the employment relationship ends;
the manner in which the customers are contacted after the termination;
the nature of the representations made to the customers by the former employee; and
the existence of a scheme or an intent to injure or to take over all or a substantial *622 part of the former employer's business. National Oil Service v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980).
National Oil Service, Brown's employer, was in the business of collecting waste oil and processing it for resale. The employer sought injunctive relief and damages against Brown and two other employees who tried to divert business for their own benefit before their employment relationship ended, collected and sold oil without remitting the proceeds to the employer, took the employer's equipment and records, left without notice, hired other experienced employees away from the employer, and told customers that the employer was no longer in business or was doing business under the name of the employees' newly formed company. The court granted some, but not all, of the injunctive relief sought by the employer before trial, noting that the employees "schemed to virtually close down [the employer's] business while starting their own, using the same customers, the same key employees, much of [the employer's] equipment and some of the capital obtained through the sale of [the employer's] oil." 381 So.2d at 1274.
In Dufau v. Creole Engineering, Inc. and in Huey T. Littleton Claims Service v. McGuffee, cited supra, unfair competition was found where the employee who planned to go into business for himself solicited customers or diverted sales away from his employer's business before the employment relationship ended.
Here, the trial court made this assessment of Dr. Core's conduct:
Dr. Core testified, and there is no evidence to contradict it, that he selected from the Martin Animal Hospital client list only those clients that he had a personal relationship with, and these were some of the clients who used the Bossier Clinic where Dr. Core practiced. He said that he felt that he had a professional obligation to these clients to let them know where he would be. These announcements were sent out after the parties terminated their relationship. Dr. David Davis, another veterinarian who was called as an expert witness, testified that it was his opinion that veterinarians owed a duty to their clients to let them know where they were practicing veterinary medicine. In the opinion of the court, the announcements were not solicitation.
The court is also of the opinion that as used in this case, the use of the client list was not a violation of the Trade Secret Act. A list of customers or clients may be a trade secret, but Dr. Core selected only the names of his personal clients. This is information peculiar to him, and sending announcements to these individuals is not a violation of the Trade Secret Act.
Dr. Core did not mention his planned move to any Martin Animal Hospital clients before he left. His announcements after December 28, 1985, merely stated the location of his new practice and did not discourage or deter anyone from choosing to continue to use the services of Martin Animal Hospital. Only about half, or 178, of the 360 Martin Animal Hospital clients who received Dr. Core's 1986 announcements used Dr. Core's services after he moved. Seventy-four of the 178 clients who followed him were his friends or relatives. The number of Martin Animal Hospital clients who used Dr. Core's services after he moved is less than ten percent of the 1,980 clients who were served by Dr. Core when the case was tried.
Dr. Core clearly did not solicit clients or divert business from Martin Animal Hospital before his employment relationship with Dr. Martin ended. The record supports the trial court's conclusion that Dr. Core did not intend to injure or destroy Dr. Martin's business simply by selectively copying, on or before December 28, 1985, the names and addresses of clients whose pets he had cared for in the past, and sending, after December 28, 1985, those clients announcements of the location of his new practice.

DECREE
At Dr. Martin's cost, the judgment is AFFIRMED.